## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JOHNNY LETT** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case Number: _____** |
| | ) | |
| **UNUM LIFE INSURANCE** | ) | |
| **COMPANY OF AMERICA,  and** | ) | |
| **AUTOZONERS, LLC Plan** | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff Johnny Lett ("Mr. Lett") brings this action for violations of the Employee Retirement Income Security Act of 1974 (hereafter "ERISA") committed by Unum Life Insurance Company of America ("Unum") and AutoZoners, LLC Plan ("the Plan"), in connection with the provision of ERISA-governed disability benefits under the group insurance plan.  In support of the relief requested herein, Plaintiff alleges the following upon personal knowledge and as to all other matters upon information and belief based upon, inter alia, the investigation made by and through his attorneys:

### Introductory Statement

1.     This is an action for legal and equitable relief and for statutory penalties, seeking redress of violations of the ERISA.  This suit is brought pursuant

to 29 U.S.C. § 1132(a) and (c) to secure disability benefits due to Plaintiff through the plan benefit sponsored by AutoZone, to redress abuse of the claim procedures by Unum to prevent future harm to the Plaintiff and other claimants, and to seek penalties for failing to provide vocational documentation that alters the Plan document.

2.     The Plaintiff seeks all benefits to which he may be entitled should this Court determine he is "disabled," including long-term disability benefits under the Plan.  The Plan is attached as **Exhibit A** and provides the benefit for the AutoZone employees who are participants.  Plaintiff also seeks such benefits together with any other disability-related benefits the Plan or other plans may provide based on the conditions documented in his medical records and evidence.

3.     Plaintiff seeks a declaration and orders as necessary to correct Unum's corrupt claim procedure and statutory penalties.

## <u>JURISDICTION</u>

4.     Jurisdiction is appropriate under 28 U.S.C. § 1331 in that 29 U.S.C. §1132(e) confers jurisdiction upon the district courts of the United States where, as here, Plaintiff's claims relate to an "employee welfare benefit plan" and/or an "employee pension plan" as those terms are defined within 29 U.S.C. § 1001, <u>et. seq.</u>  The Plan and Unum "may be found" within this district.

2

5.      Venue is appropriate in this District Court pursuant to 29 U.S.C. § 1132(e)(2), in that the employee welfare benefit plan at issue was at least partly administered in this District and Defendant may be found in this District.

## PARTIES

6.      Mr. Lett is a participant in the Plan at issue, and had been an employee of AutoZone, Inc. (AutoZone) for twelve years.

7.      Unum is a foreign corporation that does business by agent or otherwise in the counties in the Mobile Division and is a "fiduciary" of The Plan as that term is defined by 29 U.S.C. § 1002(21).

8.      The Plan is administered in the counties in the Mobile Division.

9.      Unum is an entity exercising authority and complete control respecting  this benefit claim and it operates under a conflict of interest as it pays claims out of its own resources.

## THE PLAN

10.      The Plan was put in place by the employer, AutoZone, to furnish long-term disability benefits ("LTD") for its employees, when due to disability they could not perform their occupation without reasonable accommodation, and then also if unable to perform any occupation.  Unum was the insurance company which represented it could provide those LTD

3

benefits.

11.  Unum entered into a contractual arrangement with AutoZone in the document attached as **Exhibit A**.  Unum provided AutoZone employees a <u>certificate of coverage</u>.  Both documents together form the Plan document upon information and belief.

12.  Employees were required to pay all contributions toward premiums for the long-term disability coverage.

13.  The Plan's intent was to provide financial protection while an employee was disabled from performing his job for two years and then any job.

14.  The Plan defines disability as follows:

You are disabled when Unum determines that:

-you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and

-you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury; and

-during the elimination period, you are unable to perform any of the material and substantial duties of your regular occupation.

After 24 months of payments, you are disabled when Unum

4

determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

You must be under the regular care of a physician in order to be considered disabled.

We may require you to be examined by a physician, other medical practitioner, and/or vocational expert of our choice.

## Factual Basis of Claims

### Mr. Lett's Job Description and Occupational Requirements

15.     Mr. Lett was a Parts Sales Manager for AutoZone which sells auto parts in the national economy.  The auto parts include batteries, chargers, and cases of oil and transmission all typically weigh more than 20 lbs. Some parts or supplies exceed 50 lbs.  Mr. Lett was also required to operate cash registers, manage commercial accounts, make deposits and other financial matters, and oversee store personnel.

16.     Mr. Lett was required to lift, move and carry such auto parts. Inventory, restocking shelves, or obtaining a part for customer all required these lifting and carrying duties. Further employees were required to test a customer's battery, and, if needed to be replaced, the employee was to sell a new battery. This would entail lifting and removing that customer's old battery from the vehicle and lifting and

installing a new battery into the vehicle. Mr. Lett's occupation was at least a medium physical demand occupation and in some instances, when parts exceed 50 pounds it would be considered a heavy physical demand occupation according to the United States Department of Labor's Dictionary of Occupational Titles.

17.     AutoZone operates in the national economy. As the largest American retailer of aftermarket automotive parts and accessories. It is a publicly traded company with 7,014 stores across the United States, Mexico, Puerto Rico, Brazil and the US Virgin Islands. It is, in every sense, a national employer, with consistent employment positions to operate stores uniformly in the national economy. Mr. Lett was performing his occupation in the same manner as was performed at other stores throughout the nation.

18.     AutoZone, the employer and plan administrator for the Plan made clear that Mr. Lett's occupation required lifting of over 20 pounds, squatting, and climbing ladders. These tasks were determined to be essential functions of the job as it was performed across the nation in its many stores.

### Accident Crushes Face and Breaks Neck and Ribs

19.     Mr. Lett was involved in a motor vehicle accident on March 26, 2022, which, in the words of his physician, "nearly obliterated his neck". He was driving

his vehicle when it plowed into a stopped 18 wheeler rig. The front end of his vehicle was crushed into the backseat passenger compartment. Photographs of his vehicle at the scene and after it was towed away were submitted to Unum.

20.    Mr. Lett survived the accident, but crushed his face, broke his neck, broke ribs, experienced a concussion and suffered various lacerations. He was taken by ambulance from the scene to Monroeville Hospital. Due to the severity of his injuries, he was taken by Life Flight to Sacred Heart hospital in Pensacola, Florida about 93 miles away. He had a broken neck at C-7, a large frontal hematoma, broken ribs at 1, 3, and 6, multiple LeFort (mid-face) fractures, and vermilion boarder laceration of his upper lip. He did not remember the accident due to traumatic injury to his brain. Photographs of these injuries were submitted to Unum.

21.    He was operated on by a neurosurgeon on March 29th who fused his neck together at multiple levels and performed a laminectomy.  The crushing of his face and nasal passages was cared for by an otolaryngologist.  His face required sutures.  His ribs were treated with pain management.

22.    While he healed from surgical procedures his neurosurgeon imposed typical lifting restrictions of 20 pounds or less and to engage in activity only as tolerated.  The surgery took place in Pensacola, Florida and his neurosurgeon's

practice was also located in Pensacola about 93 miles from Mr. Lett's home. This lifting <u>restriction</u> remained in place until June 15, 2022.

23.    Lett was also treated by Dr. Barnes a primary care physician, whose practice was only about 26 miles away from Mr. Lett.   The treating doctors conferred, and it was agreed that given the closer proximity of Dr. Barnes's office, his respected abilities and knowledge of Mr. Lett's conditions, he would take over provision of limitations after June 15, 2022.  This was communicated to Unum as well.

24.    While Mr. Lett healed from the neck fusion surgery of multiple vertebrae, he continued experiencing significant pain, limited range of motion, limited mobility, and difficulties with pain medication. Post traumatic arthritis set in as well. This was expected after a traumatic accident.

25.    Mr. Lett continued to be treated by Dr. Barnes on a regular basis. On June 23, 2022, after a physical examination Dr. Barnes found he was unable to work due to severe pain and limitation to range of motion in his neck.  Dr. Barnes regularly found ongoing limitations which preclude Mr. Lett from performing his occupation.

## The Claim Process

26.    After his accident, Mr. Lett filed a claim for long term disability benefits under the Plan and Unum eventually paid the claim. On June 21, 2022, Unum approved Plaintiff's case for LTD benefits, with payments beginning around that time.

27.    Support for the claim came from Dr. Barnes, who opined, after repeated exams, that Mr. Lett was not capable of performing his occupation. On August 3, 2022, Dr. Barnes's exam revealed that Mr. Lett had great difficulty with bending, lifting, stooping, squatting. He further noted that Mr. Lett can hardly flex or extend at the waist and with his cervical spine. He was having problems ambulating.

28.    On August 8, 2022, Dr. Barnes gave limitations: "unable to lift due to spinal injury; impairment permanent."

29.    On September 2, 2022, Dr. Barnes noted: "UNUM Request for Limitations: unable to return to work; standing for 15-20 minutes causes him to have headaches, neck and low back pain; objective correlation evidenced by the mechanism of injury due to his MVC."

30.    Unum, for unknown and inexplicable reasons reversed course and inconsistently terminated the claim, only three months after it began paying the

claim by letter of September 14, 2022. It stated, "We have determined you are not limited in performing the demands of your occupation." The letter argued that the medical records supported Unum's assertion, particularly that the surgery was a success.

31.    The letter falsely and improperly asserted that Mr. Lett only had 180 days from his receipt of the letter to appeal or challenge the claim termination. The actual deadline was January 6, 2024 which we understand now that President Biden declared the National Emergency over as of May 11, 2023. Otherwise, the time for his appeal could have been extended even further. See, RULES 26354 Federal Register / Vol. 85, No. 86 / Monday, May 4, 2020 / Rules and Regulations . That inaccurate statement in the claim decision letter violated the United States Department of Labor requirements, and the minimum standard of a full and fair review.

32.    The letter also was not specific or clear on why Dr. Barnes's restrictions were no longer valid, and why Unum believed Mr. Lett was fully capable of working when in fact he was not. Not realizing Unum had failed to be specific in its letter and not realizing it had improperly stated matters as to the appeal timeframe, Mr. Lett challenged that decision, assuming there was merely an oversight, by a note dated October 4, 2022.

33.    After Mr. Lett had asserted his appeal, Unum by letter dated October 27, 2022, ironically Unum noted the U.S. Department of Labor (DOL) <u>required</u> it to provide the opportunity to review and respond to new or additional evidence.  The additional evidence was a review performed by Dr. Howard Grattan a physician out in California who had never seen Mr. Lett.  It informed Mr. Lett that he only had until November 11, 2022 to provide a response to that information.  Unum also had conducted a vocational evaluation during the appeal which wrongly opined that Mr. Lett's occupation was a light physical demand occupation. Dr. Grattan's report relied on that vocational information. That report was <u>not</u> provided, and this violated the regulation.  Mr. Lett, not knowing Unum altered how his job was performed, only affirmed that his treating physician continued to find him disabled from performing his occupation.

34.    By letter dated November 17, 2022, Unum confirmed its original decision.  Much more detail was provided on this review that was not contained in the original decision which would have impacted Mr. Lett's decision on the timing of his appeal. The reasons given were:

a.  An Appeals Vocational Consultant (M.Ed., CRC, CEAS) reviewed your job description and occupational demands and concluded your

occupation in the national economy is most consistent with Assistant
Manager Retail Store (eDOT 185.167-515). The physical demand
requirements for this occupation are described below: … Light Work …"
This expert report was never provided to Mr. Lett before the appeal
decision was made. That violated the law and Unum well knew this
requirement given it knew to produce Dr. Grattan's report which <u>relied on</u>
this vocational opinion.

b. Unum further contended diagnostics were noted "April 29, 2022 x-ray of
your thoracic spine reveals mild degenerative disease, and uncomplicated
cervical thoracic posterior fusion hardware. Also Unum asserted that a
repeat x-ray on July 06, 2022 of your thoracic spine again reveals mild
degenerative changes without acute findings. These assertions were
unintelligible given the x-rays occurred <u>during a time when Unum paid
the claim</u> finding Mr. Lett disabled.  This confused Mr. Lett.  Further it is
generally understood that x-rays do not reveal pain or muscle spasms,
and the absence of hardware complications does not correlate to the
absence of pain. Increased degenerative changes not seen before
underscored the pain and spasm complaints of Mr. Lett.

c. Next Unum noted that a July 18, 2022 neurosurgery follow up exam by

12

Lyndsay Normal, APRN, "notes strength and sensation are intact event though you report your pain level of 8/10 with reports of progressive neck pain and muscle spasms. You were referred for physical therapy and pain management. Postoperative restrictions of no lifting over 20 lbs were lifted and Mr. Lett was advised you may resume activities as tolerated."  This was during a time when all physicians and Unum understood that Mr. Lett's restrictions were being provided by Dr. Barnes and not Dr. Villar or his office.  Further the lifting restriction of 20 lbs would not have precluded light physical demand employment at any point going back to the surgery if that was truly relevant to Mr. Lett's occupation. Clearly under Unum's improper vocational analysis finding Mr. Lett's job was "light" he would have been able to work only days after his wreck. The assertion was nonsensical, inconsistent, and irrational.

d. Unum admitted Mr. Lett was evaluated by physical therapy on July 25, 2022, at which time he reported neck and left thigh pain rated at 7/10, generalized weakness and a loss of functionality.  He had moderately limited range of motion of the neck. Unum concluded, no further physical therapy records have been received and it does not appear you

13

remain under the care of physical therapy. Unum inferred Mr. Lett was fine and did not need the treatment. Since Unum knew Mr. Lett was "self pay", as he lost his health insurance, any implication that Mr. Lett miraculously recovered, and all problems resolved was unfair, unwarranted, and demonstrably false. He could not pay what was required for therapy or extensive medical care without insurance and the ability to work.  The policy only required him to be under the care of a physician, not a fleet.

e.  Unum noted that on October 3, 2022, Dr. Stanley Barnes's examination revealed decreased strength of the upper extremities between 3/5 and 4/5 at this visit only, but disregarded his opinion on restrictions.  It contended that no other records show loss of strength in your upper extremities. However Dr. Barnes was the primary physician treating Mr. Lett, and he was responsible for documenting restrictions. Further given Mr. Lett was "self pay" he could not be treated by multiple providers, so there were no other records.  A pattern of disingenuous conduct is clear.  Unum was requiring more than care by a physician.

f.  Unum then contended that Mr. Lett was not pending any additional surgery of his spine.  Surgery is not a cure all for pain.  It is common for

14

spasms and pain to exist and sometimes increase <u>after</u> surgery. There is no medical data to back up this conjecture.

g. Unum next contended that although Mr. Lett reported pain increasing, the physical examinations remained unchanged. That of course was not true since Dr. Barnes and the neurosurgeon's office had reported increased pain and spasms from July through October 3, 2022. Dr. Villar's nurse recommended injections and pain management. Unum's review was clearly error laden and contrived to reach a preordained result in favor of Unum's conflict of interest as it pays benefits out of its own coffers.

h. Unum contended all complaints of dizziness and drowsiness due to medications, had no correlating findings on exam which support cognitive impairments. This is nonsensical, as many pain medications are known to cause drowsiness and mental impairment and in fact warnings are commonly put on pain medication prescriptions about that. If Unum expected there would be treatment for cognitive impairment that is commonly known to impact people, Unum did not specify what treatment should exist and would be reasonable and necessary under the circumstances. Unum did not specify what evidence would be expected

to exist.  Further Mr. Lett could not afford treatment by a "fleet" of doctors or medical providers.

i. Unum wrapped up its reasoning contending there were no findings such as an unsteady gait or positive Romberg sign to correlate with your reports of dizziness.  Therefore, Mr. Lett was lying about medication impairing him. This man whose neck was broken, and face was crushed only a few months earlier and now had a neck fusion across multiple levels (requiring him to turn his entire torso just to turn his neck), and who had ongoing degenerative changes throughout his cervical spine, was found by Unum to be lying without any Unum physicians examining him.  There is no medical literature that Romberg sign is a reliable indicator demonstrating that pain medication causes dizziness. It might be used as a quick screen to lead a clinician toward further testing but that would not be necessary when the dizziness correlated to ongoing use of pain medication and no prior history of dizziness.  Further Dr. Barnes did indicate that Mr. Lett had difficulty ambulating but that was due to his body had suffered severe trauma.  He could not stand very long, nor stoop, bend, or turn his neck, and so forth.  He never stated there was an unsteady gait and that is an irrelevant assertion.  Further there is no

16

medical evidence that a neck fusion, busted face, broken ribs, and degenerative changes in the cervical spine causes an unsteady gait.

35.    Mr. Lett was very confused as to how Unum found he was disabled based on the medical records and then used those same medical records to find he was not disabled.

36.    Unum did not provide Mr. Lett with a meaningful opportunity for a full and fair review of his claim for benefits as required by 29 U.S.C. § 1133 and 29 C.F.R. 2560.503-1. Unum's decision process has not comported with 29 U.S.C. § 1133's requirement that any notice of the original denial must contain the specific reasons for such denial, written in a manner calculated to be understood by the participant, and must comport with Department of Labor regulations which require consistent claims adjudication.

37.    Claim terminations like this played a big part in Unum having a very strong financial year in 2022. Richard P. McKenney, President and Chief Executive Officer for Unum attributes this success to its Group Disability line. It appears Mr. Lett's claim termination was part of an overall push to deny valid claims to increase company profits.

38.    Mr. Lett would like to return to work but knew the pain and limitations he had.  He sought a return and inquired with his employer about an accommodation

from the heavier lifting requirements, more sitting breaks when pain was intolerable and avoidance of squatting and climbing ladders.

39.     Accommodations could not be made to permit Mr. Lett to return to working in the store in his occupation. His only accommodation was time off to heal, but ongoing physical limitations could not be accommodated.   To work with limitations, AutoZone contended he would be required to delegate certain essential functions involving lifting over 20 pounds, squatting, climbing ladders and so forth. AutoZone has interpreted the restrictions to mean that he would be required to take rest breaks for up to 25% of his working time during the day, and delegation of essential functions of the parts sales manager position to other employees. He was terminated.

40.     AutoZone said Mr. Lett could not perform his job and Unum said he was not disabled from performing his job. Mr. Lett was placed in an impossible position and his family had been suffering financially.

41.     Mr. Lett hired counsel and counsel sought all plan documents, claim manuals, guidelines and protocols that were used on the claim along with the claim record which should contain all of the information relevant to the claim.  A partial claim record was provided, but it did not contain all information such as amounts paid to reviewing doctors, and all communication in obtaining these doctors as well

18

as prior drafts of report.  Most importantly it contained nothing in the way of data and investigation of Mr. Lett's occupation and any support for findings that his job was light.  What was provided reflected a preordained decision that began with an irrational and inconsistent nurse review which was then parroted by physicians who were not truly independent but biased and did not conduct thorough reviews.

### The Claim Record Reflects the Wrong Occupation Was Used

42.    Upon review of the claim record it was evident that Unum had used a vocational consultant and eDOT to incorrectly assert that Mr. Lett's occupation was merely a retail occupation and did not require heavy lifting.  The vocational consultant Deborah Nix in July, 2022 found that Mr. Lett's job was merely an assistant manager for retail store. This was considered light work only requiring lifting up to 20 pounds occasionally. That may be true for clothing stores, but not for an auto parts store where heavy batteries, battery chargers, cases of transmission fluid and oil must be lifted and moved.

### The Forum Directed the Result

43.    The claim record documents that a "forum" of various personnel (for Unum this is often a meeting of the claims adjuster, the director, a vocational consultant and a nurse) was conducted after that. The nurse was requested to provide a review of the medical records. On <u>July 13, 2022</u> nurse Brellenthin provided that

19

review of the medical records and found that Mr. Lett's restrictions and limitations <u>were demonstrated</u> through August 15, 2022.

44.    Apparently other individuals within Unum were not satisfied with that response, and so another forum was conducted on August 22, 2022.  This same nurse, after this forum, now inconsistently and irrationally found that Mr. Lett was not precluded from performing the full time functional demands of his occupation as of July 18, 2022. Again the occupation used was a light physical demand occupation of assistant retail store manager, not auto parts store manager.

45.    This served as the basis to deny the claim and later the appeal. As noted above the reasons for denying the claim had no merit and were irrational and inconsistent.

46.    In order to buttress the decision of the forum and in particular nurse Brellenthin, the nurse review and medical records were provided to a physician who adopted the nurse review as her own report notwithstanding the numerous errors.

**Dr. Misilri Parrots the Nurse Report and Reviews the Wrong Records**

47.    This review was by Unum's own Dr. Jeanine Misirli, a family medicine physician who performed a review on August 30, 2022.  She is only licensed in California and never saw Mr. Lett.  She agreed with Unum's nurse that Mr. Lett "remained out of work due to recovery and continued pain."  Yet in order to meet

20

the objective of terminating benefits, she now disregarded continued pain and declared Mr. Lett ready to go back to his occupation.  That is only 5 ½ months after he nearly died with a broken neck, crushed face and fusion.

48.    Dr. Misirli adopted as her own report the nurse's report nearly verbatim noting, "At the 05/10/22 office visit the insured was noted to keep his head inflexion due to pain with extension. At the 06/15/22 visit he was noted to have reduce [sic] flexion and extension of his cervical spine, and then on 08/03/22 he was noted to 'hardly flex or extend at the waist nor his C-spine'. Range of motion is subject to the insured's effort and although the insured incurred a significant injury, the insured would be expected to improve with time, as the medical record nor the insured reports additional injuries or additional treatment to indicate a new injury."

49.    There is no medical literature demonstrating that an individual who suffered a traumatic accident crushing his face, breaking his neck and ribs, experiencing ongoing pain and arm spasms, should magically be fully recovered and able to return to work within six months of this wreck. That is sheer speculation intending to meet a preordained result of terminating the benefit.  Doctors wishing to evaluate the credibility of pain complaints must examine the patient since pain can vary from person to person, and since the ability to obtain medical care can vary.

50.    This unreliable report overlooks post traumatic arthritis which *commonly* develops with traumatic injuries, especially for a 56-year-old man. Unum's reviewing nurse, with whom Dr. Misirli agrees, stated, "Visit with Dr. Barns [sic] (PCP) on 05/10/22, 06/15/22, and 08/03/22 noted a well healed scar, 'evidence of arthritis'." Dr. Barnes's records document cervical disc disease repeatedly as well as arthritis in the upper extremities and osteoarthritis generally. That is a significant failure for Dr Misirli as well as nurse Brellenthin to document and then simply ignore posttraumatic stress arthritis and ongoing pain and spasms documented by the neurosurgeon's office.  Both improperly ignored evidence of degenerative arthritis, spondylosis, and facet arthropathy which are known to involve chronic pain complaints.

51.    Dr. Misirli mimicked the nurse report again noting "A 07/18/22 office visit with APRN Norman (neurosurgery) revealed all extremities to be well perfused, there was no edema, sensation was intact, he moved all extremities well, and upper and lower extremity strength was 5/5 indicating a good surgical outcome and that the insured if neuromuscularly intact."  This time the mimicking evidenced cherry picking.

52.    Missing from that summary by Dr. Misirli is that the nurse practitioner's note stated: "activity as tolerated" which indicated that pain and

spasms would limit Mr. Lett.  In fact, before that sentence the neurosurgery nurse practitioner noted the discussion of increased pain and problems when Mr. Lett was using his arms.  She said this was likely spasms from surgery and initial injury.  The note states:

"Patient f/u today reporting recent progressive neck pain and muscle spasms with using arms. He expresses frustrations in his recovery d/t his symptoms. continues to note neck stiffness. gait stable. …-Referral to PM also placed to explore <u>trigger</u> <u>point</u> <u>injections</u> as needed to help with <u>muscle</u> <u>spasms</u>." (Emphasis added).  This note does not reflect that Mr. Lett is "okay now" and can return to work. Clearly there were ongoing limitations, and it is unsupportable and misleading to say otherwise.

53.    The note continued "Plan - Discussed current symptoms, likely spasms from surgery and initial injury.  Hopeful that PT will be helpful. … Referral to PM also placed to explore trigger point injections as needed to help with muscle spasms. - AI post-op restrictions lifted, activity as tolerated."  PM is pain management.

54.    Selecting one snippet from the note instead of the majority of the note was necessary to fit the preordained determination to terminate benefits. That is unbecoming of a fiduciary however. There was complete avoidance of mentioning the neurosurgery Nurse Practitioner's recommendation of physical therapy, trigger point injections, and pain management due to complaints of pain and muscle spasms.

Clearly the nurse practitioner had ascertained that Mr. Lett's pain complaints were credible during the course of a physical examination.  Yet Unum avoided its own examination under the policy.

55.    Dr. Misirli noted in her report her attempt to contact Dr. Barnes's office on August 30, 2022, but not about Mr. Lett. She was calling about a Mr. *Glenn Lefors* and then described his claim. This is a completely different person and unrelated to Mr. Lett in any way.  This clearly indicates that Dr. Misirli has egregious errors in her report and it is entirely unreliable as medical conditions not afflicting Mr. Lett were in her discussion.

56.    Dr. Misirli further copied the nurse review arguing "Mr. Lett was referred to physical therapy and pain management however it does not appear to have appointments scheduled." [sic]. This ignores the fact that Mr. Lett was now without health insurance due to his in ability to work. He was noted as "self pay" on the July 18, 2022 visit with Dr. Villar's office.  Further, Dr. Barnes specifically stated that he would take over pain management and physical therapy.  He indicated "pain management will be done by our office including injections, medication, physical therapy when possible. He is unable to return to work." That was ignored as it did not fit the preordained result.

57.    It is most interesting that Dr. Misirli never disagreed with nurse Brellenthin's inconsistent conclusions in her report. The first report found limitations supported into August and the second report found limitations were not supported retroactively back to July 18, 2022. Thus Dr. Misirli certainly failed to review the file closely enough to understand and then explain the inconsistency. She also relied on the wrong occupation which was retail store manager rather than auto parts store manager.

**Unum Breaches the Regulatory Settlement Agreement**

58.    Dr. Misirli's report alone was not enough to deny the claim since Unum is still under a Regulatory Settlement Agreement with many states due to past abuse of the claim process.  Two physicians are required.  Unum did not comply with its agreement in this matter:

*        It was required to contact an attending physician where circumstances warrant. Here Dr. Misirli only attempted to contact Dr. Barnes (regarding a different patient at first).  Her last effort was shortly before a decision was already made, and he affirmed limitations. There was no effort to contact Dr. Villar's office to "clarify" the July 18, 2022 visit if needed.

\*      Second Unum did not attempt to obtain a field visit where
circumstances warrant. If Unum was concerned about whether Mr.
Lett truly was in pain it could have conducted a field visit to observe
this personally.

\*      Unum was required to obtain an IME or a functional capacity
evaluation when appropriate. Dr. Misirli said it wasn't necessary here,
but clearly if pain complaints were not believed when all treating
physicians documented the same, then an IME or FCE was
appropriate.

\*      Missing from the claim record also is the professional certification by
each clinical vocational and medical professional employed by the
company documenting that individual's commitment to provide a fair
and reasonable evaluation.

59.    Unum is also required to conduct reviews that consider all impairments
(including pain) but then it must also utilize a physician who is a specialist in this
area of concern.  Accordingly, Unum needed another doctor, who is a specialist, to
agree with Dr. Misirli. It was suggested that Unum obtain a review from Dr. Jamie
Lewis who is also licensed in California but practices in Physical Medicine and
Rehabilitation.

**Dr. Lewis the Second Doctor**

60.     Dr. Jamie Lewis graduated from a small medical school called the Loma Linda University School of Medicine in 2002.  Dr. Misirli also graduated from that school in 2005. However, Dr. Lewis stayed at the school participating in the Loma Linda University Health Education Consortium and the Loma Linda University Health Education Consortium Residency, Physical Medicine and Rehabilitation from 2002 – 2006.  Dr. Misirli then had three full years with Dr. Lewis.  Given that the school typically had less than 800 students total and each class had less than 200 students, it is extremely likely that both physicians knew each other. Unum was asked to explain this relationship, but it refused.

61.     Dr. Lewis is a frequent source for insurance companies. He has been criticized by courts for ignoring pain without ever examining a claimant. Shaw v. AT & T Umbrella Benefit Plan No. 1, 795 F.3d 538, 550 (6th Cir. 2015) criticized Reliance Standard and Dr. Lewis for this, "However, without ever examining Shaw, the Plan should not have made a credibility determination about Shaw's continuous reports of pain." Id. at 550. In Galuszka v. Reliance Standard Life Ins. Co., No. 2:15-cv-241, at *38 (D. Vt. Jan. 9, 2017) the court noted in a case in which Dr. Lewis provided a record review "[t]he subjective element of pain is an important factor to be considered in determining disability."

62.    Dr. Lewis largely mimicked the review of the nurse as well.  There were no efforts to explain discrepancies and inconsistencies with the nurse reviews nor as to Dr. Misirli's reference to the wrong patient and records. This was all ignored and the prior reports were merely rubberstamped without exception.

63.    Dr. Lewis went alone with one assertion.   He says "Postoperative imaging studies of the spine reveal degenerative changes and stable postoperative changes without evidence of hardware complication."  ***This was from a 4/27/2022 x-ray*** which was during <u>a timeframe when the claim was paid</u>.  An x-ray on July 6 2022, revealed the same thing *except the degenerative changes were now multi-level*. Post traumatic arthritis was clearly worsening!  The logic behind this assertion is impossible to follow.  It is irrational.

64.     Dr. Lewis seems to contend that only individuals with hardware complications are disabled, and that muscle spasms that increase with use of the arms are post-traumatic arthritis is of no concern despite the impact of disc degeneration on the spinal cord.

65.    While post-traumatic arthritis is worsening, it is also noteworthy that an x-ray does not reveal pain, ligament damage nor other soft tissue injury. The imaging studies referenced were intended to make certain that the hardware remained in place to allow for further healing.  They do not speak to pain.

28

66.    Pain and muscle spasms were noted along with frustration over the failed recovery to return to work on 07/18/2022 with neurosurgery and in Dr. Barnes's later visits and attending physician statements.  This was ignored by Dr. Lewis.  This opinion also relied upon the light physical demand occupation of assistant retail store manager and not the actual occupation of auto parts assistant store manager.  The opinion has no merit.

67.    The claim record established that the claim was terminated based on the nurse review and both doctors copying erroneous and inconsistent conclusions in that review.  If Unum was consistent and believed the nurse review the claim should have been terminated as of July 18, 2022, but somehow Unum, without reason, chose the date of September 14, 2022.

**Dr. Grattan**

68.    When Mr. Lett appealed the claim, with Unum's confusing reasons to terminate the claim, Unum looked for another doctor to review the claim.

69.    Unum selected Dr. Howard Grattan who is also licensed in California and certified in physical medicine. It was no coincidence that he too went to Loma Linda School of Medicine, a surer way for Unum to make sure your doctors all agree. In fact, Dr. Grattan and Dr. Lewis were classmates and graduated together.  Dr. Grattan also stuck around after medical school with an internship and residency at

the school until 2006. He also had at least three years with Dr. Misirli. He had eight years with Dr. Lewis.

70.    Dr. Grattan is also regularly used by insurance companies to support claim terminations and refusal to pay benefits. He is so overused by insurance companies that there are more than 20 reported cases involving Dr. Grattan. When a physician is used excessively by only one side it indicates his bias toward the payor of his fee.

71.    Dr. Grattan's report was clearly predicated on the wrong occupation being a light physical demand assistant retail store manager occupation rather than auto parts store assistant manager. Further he was requested to document the ability to perform that wrong occupation as of September 15, 2022 the day after the claim was denied on September 14, 2022. This was in conflict with the nurse Brellenthin determination of July 18, 2022 and the September 14, 2022 date. There never was an explanation of these differing dates by Unum. The claim process was irrational and arbitrary.

72.    Dr. Grattan also largely mimicked the nurse review joining in the misinterpretation of the neurosurgery nurse practitioners visit of July 18, 2022 which confirmed muscle spasms and progressive pain with the need for injections, pain management and physical therapy.

73.    Dr. Grattan's review of the records is also misleading. First of all, he states "claimant only attended a Physical Therapy Evaluation dated 07/25/22. There are no further progress notes indicating the claimant remains under the care of physical therapy." The implication is there is no pain yet he ignores the actual PT record statement "severe limitations to activity, moderate difficulty to rotating neck, moderate difficulty operating vehicle safely, severe pain, moderate segmental deficit, and moderate weakness with 3/5 strength."  Dr. Grattan was called out for this by a judge in <u>Miller v. PNC Fin. Servs. Grp., Inc</u>., 278 F. Supp. 3d 1333, 1344–45 (S.D. Fla. 2017) dismissing Dr. Grattan's report for failing to address the Plaintiff's medical evidence.  It is improper to cherry pick evidence from reports and it violates the minimum standards of a full and fair review and Unum's Regulatory Settlement Agreement.

74.    Dr. Grattan tried to be unique with his report in one respect going out on a limb and irrationally asserting "The insured's documented activities or demonstrated capacity appear incongruous with the stated level of impairment. The insured has report that he is able to drive, run errands/go to the store and complete his ADL's which is inconsistent with his reported severity of neck pain and reduced range of motion."  This assertion is illogical.

75.    Even using the light physical demand level, remaining physically on your feet for at least six of eight hours of the work day, using your arms constantly and being able to regularly lift up to 20 pounds is a level of physical activity far above being able to drive to a local store or get on and off the toilet, put on clothes, and feed yourself. There is no documentation as to how long Mr. Lett is able to drive or how long he takes to complete errands and the timeframe he is standing up in doing these tasks so there were improper assumptions made.  Dr. Grattan makes quantum leaps with his assumptions. To say that someone can work a light physical demand occupation because they can drive to a grocery store ¼ of a mile away and pick up a loaf of bread and go home does not prove light physical demand capacity. That is completely illogical.

76.    After seeing this report, Unum still failed to explain otherwise how the ability to perform your ADLs (e.g. feed, dress, get on a toilet) translates into a full-time light physical demand occupation. This decision is irrational.

**Second Appeal Submission**

77.    Given the breaches of the minimum standards of a full and fair review, Counsel demanded that Unum consider further evidence and permit an appeal again to remedy the defective appeal provided, rather than proceed straight to litigation. A

remand from litigation would likely be required anyway given the clarity of the violations.

78.    The six main problems noted were:

A. Unum used the wrong physical demand level for Mr. Lett's regular occupation and failed to investigate the requirements of his occupation. This stemmed from the use of eDOT which is too generic and not supported with objective data.

B. Unum failed to provide the vocational expert report considered on appeal before it made its decision.

C. Unum misrepresented the timeframe for an appeal.

D. Unum omitted from its claim record documents relating to the basis of the vocational opinions, the compensation paid to vocational experts, the compensation paid to its physicians, and a few other matters.

E. The physician reviewers parroted the nurse review which cherry picked the evidence to support claim termination.

F. The physician reviewers are biased and conducted poor quality reviews based on the wrong occupation. The reviewers were not "independent" as all from the same medical school, attended at the same time, and two graduated in the same class.

79.    Unum relented to redressing the problems and Mr. Lett submitted an appeal, carefully outlining over the course of 31 pages why this claim should be paid. At least 11 exhibits were submitted. A functional capacity evaluation (FCE) by an occupational therapist was submitted, given Unum's failure to have an FCE or IME performed. This FCE provider performs such reviews for insurance companies as well as for claimants.  He took actual measurements of the Plaintiff's physical ability rather than rely upon speculation and error as Unum's doctors have.

80.    Mr. Lett demonstrated in the FCE, the ability to occasionally stand which is one-third of the workday, to sit for maximum of four hours per day, and to lift 10 pounds. Pain behaviors were documented and found credible during the course of the FCE.

81.    Dr. Barnes, a treating physician, reviewed the FCE and agreed with his findings and found them consistent with his office notes. He particularly noted that Mr. Lett is not a malingerer, and that his accident injuries, healing process and current condition are consistent given his injury, age, and documentation in x-rays and exam findings. He further noted that the accident accelerated the worsening of his prior disc issues resulting in his medical decline.  His report was submitted to Unum as well.

82.    Photographs of the damaged vehicle and Mr. Lett shortly after the accident were also provided which were conspicuously absent from the claim file. Further a video of Mr. Lett was provided with a transcript, further documenting his credibility, pain, and spasms.

83.    Further a vocational evaluation report was provided from Ashley Johnson, a vocational consultant, from Mooresville, North Carolina.  She serves as a Social Security vocational expert for the United States government, is a certified rehabilitation counselor and a qualified rehabilitation professional for the North Carolina industrial commission.

84.    Her report considered Unum's claim record, additional medical records documenting ongoing treatment for Mr. Lett, the FCE, the report from Dr. Barnes, and an interview with Mr. Lett. The report documents that Mr. Lett's job involved "resetting cells, putting up stock, installing batteries, and providing customer service."  The lifting requirements were up to 70 or 75 pounds and his job also required climbing, kneeling, and stooping frequently to perform stocking. The occupation is a medium physical demand occupation, and this was confirmed by the AutoZone job description and AutoZone's inability to accommodate Mr. Lett's limitations.

85.    The report further notes that the vocational evaluations of Deborah Nix and Shannon O'Kelley are based on eDOT which is flawed.  This occupation clearly involves lifting requirements in excess of 20 pounds. Specific examples of batteries weighing over 40 pounds were documented along with amp battery chargers weighing over 70 pounds.

86.    The report further documents this unfairness of using eDOT which is the basis of all of Unum's vocational reports on this claim.  eDOT is not accessible to the public and is only available as a paid subscription.  According to an article "A Call to Update the DOT: Findings of the IARP Occupational Database Committee", there are problems with the eDOT.  They noted the sampling plan for obtaining data is one of convenience, as jobs are only analyzed when salary information is gathered and as they are advertised.  The article also noted that the job descriptions are not as detailed as in the DOT and tend to be generic.  That is clearly the case here.  Not all retail stores are light physical demand occupations.

87.    Ms. Johnson's report found Mr. Lett limited to less than a sedentary level of work, which vocationally eliminated all competitive employment for Mr. Lett.

**Unum Denies the Second Appeal and Withholds the Medical Review**

**and the Vocational Opinion**

88.    Unum claims it reviewed the information, but it relied on the review of the same prior medical consultant, Dr. Grattan, rather than an independent consultant. In his latest report, he parrots much of the same talking points used by Unum previously to justify their inconsistent termination of benefits. In addition, it is once again based on the wrong physical demand level for his occupation (light).

89.    Most unfairly, Unum did not provide Dr. Grattan's report before it made a decision as required by the regulation. The decision then did not correct the defective appeal. De novo review is required on this matter.

90.    Dr. Grattan mentions that it is unclear why Mr. Lett would be unable to perform the duties of his occupation such as lifting more than 10 pounds or frequently standing and walking, given the lack of abnormalities listed by Dr. Barnes such as weakness, sensory loss, an abnormal gait, or swelling. However, this observation by Dr. Grattan is nonsensical.

91.    To begin, this overlooks the fact that diagnosing arthritis during multiple exams presupposes that Dr. Barnes saw swelling, joint weakness, and decreased joint mobility in Mr. Lett. That is how the diagnosis is made. In fact, a medically reviewed article on arthritis diagnosing states that during a physical

37

examination a physician will assess each of the patient's joints for pain, tenderness, and range of motion (How Osteoarthritis Is Diagnosed/ Verywell Health/ An accurate diagnosis of osteoarthritis ensures proper treatment, By Carol Eustice, Updated on April 05, 2022/Medically reviewed by David Ozeri, MD). So, these three factors are necessary for a diagnosis of arthritis. All of Unum's biased physician reviewers failed to make this connection however, calling into question once again the quality of the Defendant's physician reviews in this case.

92.    Moreover, on multiple occasions Dr. Barnes explicitly mentions some of the symptoms that Dr. Grattan claims are not noted. For example, on 8/3/22, Dr. Barnes noted that Mr. Lett was having problems ambulating. This has the same impact as gait abnormality. Pain is impacting ambulation even if the gait is not altered. One would think the physician Unum selected to do this final review would have been aware of this. To further compound these errors of analysis, on 10/23/22 Dr. Barnes noted that Mr. Lett had weakness in his upper extremities and overall global weakness. This directly contradicts the report of Dr. Grattan and calls into question his reliability since all of Dr. Barnes's comments were available in the claim record.

93.    Regardless of whether these factors were present or not does not change the fact that Mr. Lett experiences severe pain and spasms that preclude him from

performing the requirements of his occupation. For example, if there had been no muscular weakness, which was asserted by Dr. Barnes upon examination, this would not necessarily indicate a lack of pain or spasms that Mr. Lett experiences when trying to perform his occupation. Often pain felt in one area or muscle is referred pain from another area of the body. So even without weakness, which there still is, it is very plausible that Mr. Lett would be still experiencing pain from his traumatic injury to his neck, face, and spinal cord.

94.    Additionally, pain does not require there to be sensory loss. Indeed, on 10/23/22 Dr. Barnes reported that Mr. Lett was experiencing tingling (sensory loss/alteration) and pain in his arms. The pain was independent of sensory loss. A hypothetical lack of sensory loss in this case would not preclude the pain experienced by Mr. Lett that keeps him from working his occupation.

95.    Finally, a lack of swelling does not preclude the pain that Mr. Lett experiences. People have headaches, stomachaches, tendonitis, and all kinds of pain without evidence of swelling.

96.    Dr. Grattan and Unum are clearly trying to misconstrue the medical records to help them achieve the desired outcome of claim denial.  The fact is that Mr. Lett experiences far too much pain to perform the requirements of his occupation, which is a medium physical demand occupation. Dr. Grattan's claim that

there is no mention of abnormalities to explain the pain such as weakness, sensory loss, abnormal gait, and swelling is both untrue and not necessary to substantiate Mr. Lett's subjective reports of pain.

97.    Unum conducted another vocational evaluation on appeal, and it withheld that evaluation also, before it made its final decision. That evaluation disregarded a wealth of evidence submitted on known job requirements and instead on eDOT.  Dr Grattan again relied on the wrong physical demand requirement with his second report.

**Unum Omitted From Its Claim Record Necessary Documents**

98.    Counsel again requested the claim record after this second decision and any claim manual, but Unum withheld the vocational information requested. Unum should have provided the following documents, information, or data that the vocational consultant considered, relied on, or referenced in generating his or her evaluation: (a) Any information or data related to specific occupations, how they are performed, or their duties and requirements. This should include a printout of all the occupational information from the relied-upon reference (e.g., the Dictionary of Occupational Titles, O*Net, the Occupational Outlook Handbook, etc.); (b) All statistical summaries, reports, or compilations, including Department of Labor data upon which the vocational evaluator relied in forming his opinions about the

existence or prevalence of occupations in the labor market as well as the expected wages of occupations; (c) All labor market studies, job searches, or other market research performed by the vocational consultant; and (d) Each professional article or other publication. Unum failed or refused to provide this information, so Mr. Lett was not able to meaningfully or substantively respond to the evaluation.  The Plaintiff asks the reviewing court to find Unum's vocational reports conclusory and accord them no weight and require Unum to cease using eDOT or provide this information.

99.    It appears Unum was using eDOT as a claim manual and in essence dictating the definition of regular occupation in the policy. It is unfair to withhold such information from an insured, since the insured has a right to know exactly where he stands before he is in a horrible accident. Unum could write its policy to have stated that "regular occupation" means that occupation as described by eDOT if Unum intended to administer the policy in that manner. That is much less misleading.

100.   If Unum desired to challenge the credibility of Dr. Barnes's opinions as well as the credibility of the complaints of Mr. Lett, then it should have performed an independent medical examination by a fair examiner and not by physicians

merely reviewing medical records who all went to the same medical school at the same time.

101.   Mr. Lett has exhausted all known remedies for his claims and further exhaustion is futile as demonstrated in the preceding paragraphs.

## **COUNT ONE**

102.   The Plaintiff incorporates by reference all previous paragraphs of this Complaint.

103.   This Count is brought to enforce Plaintiff's rights under the long-term disability plan as permitted by 29 U.S.C. § 1132(a)(1)(b).

104.   The Plaintiff seeks to recover benefits, interest and such equitable relief as may be recoverable under this code provision and under 29 U.S.C. § 1132(g).

105.   On or about September 14, 2022, and at various times thereafter, the Defendant wrongfully, and in violation of obligations under ERISA, terminated the Plaintiff's long-term disability benefits. In particular:

a.    Unum wrongfully denied LTD benefits to Mr. Lett. Unum denied his claim without evidence of the Plaintiff's improvement and did not perform a full and fair review.

42

b.      Unum wrongfully assigned a physical demand level of "light capacity" to Mr. Lett's occupation, which requires more than the ability to lift 20 lbs. regularly throughout the workday.

c.      Unum acted as an adversary and not as a fiduciary, by disregarding the requirement to provide each claimant new evidence or rationales generated on appeal, before making a claim determination. Some Unum adjustors do honor the rule to do this, but others do not, making it clear that uniform and consistent decision making is not part of Unum's claims process. Unum further misrepresented the timeframe for an appeal for Mr. Lett and again some adjustors provide the proper timeframe for an appeal under COVID modifications to the regulations and some do not, again evidencing a lack of uniform and consistent decision making.

d.      Further Unum denied the claim relying on physicians who did not examine the Plaintiff, thus providing opinions that fell short of providing the credibility determinations necessary to assess the level of pain and muscle spasms experienced by Mr. Lett and the limitations imposed.

e.      Further the opinions of Unum's selected physicians, who all attended a very small medical school together and were biased. Each

43

physician largely mimicked a nurse review which was error laden and irrational.

f.      Unum refused to put information in its claim record creating an unfair claim process such as the amounts it paid physicians, the reasoning behind hiring physicians who attended the same small medical school together.

g.      Unum refused to accept the job requirements of Mr. Lett's occupation, which is performed uniformly by his national employer in the national economy. Instead, it fraudulently used the eDOT which is not based on information from the relevant employer nor any relevant employer in the industry in question. This misleads employees and the employer into believing there is income protection as to the inability to perform an occupation when in fact there is not.  That is because Unum switches the definition to some other occupation unbeknownst to the participant and the employer.

h.      Unum is using eDOT to supplant and alter its Plan documents. Yet it refuses to provide the eDOT which is altering its policy in a wrongful, misleading manner.  It also refuses to produce the data underlying eDOT

which would disclose that a limited number of employers are participating in furnishing data and not the employer in question.

106.   Mr. Lett has failed to receive disability benefits due since that date.

107.   Mr. Lett exhausted all provided clam procedures and/or further exhaustion is futile.

## **COUNT TWO**

108.   Mr. Lett incorporates by reference all previous paragraphs of this Complaint.

109.   Unum, by using eDOT , has altered the plain meaning of the Plan as to providing income protection. Participants in the Plan, such as Mr. Lett, reasonably expect that their own occupation is the job they are performing as it is performed for AutoZone, as well as other auto parts stores, serving in the national economy.

110.   This wrongful altering of the plain meaning of the Plan, has created circumstances for participants such as Mr. Lett, where they cannot perform their own occupation and the employer is not able to make any reasonable accommodation as to their limitations due to disability, and yet Unum denies the long-term disability claim using a different occupation that it contends is the actual occupation as performed in the national economy.

45

111.    Unum's conduct is nothing short of unfair and reprehensible. Unum has contended on many other matters including other pending litigation in which Counsel has appeared against Unum, that eDOT is software and it is proprietary. However, that is not grounds for Unum to use software to alter plan documents and withhold the information from participants. This circumvents the requirements of a full and fair review and Unum must print out and provide the data serving as the basis of eDOT or cease using it. Use of such software is unfair and reprehensible.

112.    To understand Unum's position, Mr. Lett through Counsel requested all guidelines, protocols, claim manuals or plan documents utilized to adjudicate the claim.  Clearly Unum is using eDOT so as to modify the plain meaning of the plan and thus it constitutes at the very least a guideline protocol or claim manual impacting the meaning of the plan document.

113.    This request was first made on February 9, 2023, and was also made on the employer. The employer does not have this eDOT document and thus Unum is acting as the *de facto* plan administrator for purposes of retention and production of this critical document.  A second request was made on June 29, 2023.

114.   Statutory penalties are due to be assessed against Unum for refusing to provide this electronic document, and equitable relief precluding use of eDOT for all participants in this Plan.

115.   Mr. Lett has exhausted all known procedures and/or exhaustion is futile as Unum has refused in this matter and in other cases the document in question.

## <u>A PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff Johnny Lett respectfully requests this Court find jurisdiction and venue appropriate, and after trial, grant the following relief:

a.   For an order awarding Plaintiff all benefits due and owing in accordance with the terms of the Plan and Policy identified in this Complaint, as well as all prejudgment interest due thereon as permitted by law and equitable principles, pursuant to 29 U.S.C. § 1132(a);

b.   For a judgment against Unum and the Plan awarding Plaintiff all costs and reasonable attorney's fees incurred connected to the prosecution of and pursuit of relief in this action as permitted under 29 U.S.C. § 1132(g)(1);

c.   For an order requiring Unum to cease utilizing eDOT with this Plan and to cease altering the job description of participants when the employer is

known to be engaged in the national economy and the job duties are publicly known;

    d.    For an order directing that Unum's claim procedures shall comply with the Department of Labor regulation at 26 C.F.R. §2560.503-1 as articulated to be applicable to all claim decisions made after April 1, 2018;

    e.    For declaratory relief that the Plaintiff is entitled to a *de novo* review of his claim.

    f.    For statutory penalties at the rate of $110 per day beginning March 10, 2023 and continuing until the end date is determined.

    g.    For any such other equitable relief as the Court may provide and find to be just and proper.

_____
David P. Martin, Esq. (ASB-3500-M68D)
**The Martin Law Group, LLC**
**Attorney for Plaintiff**
P.O. Box 20087
Tuscaloosa, AL 35402
Phone (205) 343-1771
Facsimile (205) 343-1781
david@erisacase.com

48

**Plaintiff's Address:**

Johnny Lett
c/o The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL 35402

**Defendants' Addresses:**

Unum Life Insurance Company of America
c/o Corporation Service Company Inc.
641 S. Lawrence St.
Montgomery, AL 36104

AutoZoners, LLC Plan
123 S. Front Street
Memphis, TN 38103

## REQUEST FOR SERVICE BY CERTIFIED MAIL

The Plaintiff requests service of this Complaint on the Defendants by Certified Mail pursuant to Federal Rules of Civil Procedure 4(e)(1).

_____
David P. Martin, Esq. (ASB-3500-M68D)